Number 191444, Gerald R. Hoolahan v. IBC Advanced Alloys Corp. Good morning, Your Honor. May it please the Court? Excuse me. Ryan Lean for Appellant IBC Advanced Alloys Corp. I'd like to reserve four minutes for rebuttal. Four minutes? Okay. Thank you, Your Honor. IBC filed this appeal with full knowledge of this circuit's long line of cases on the confirmation and vacatur of arbitration awards. These cases don't always paint the rosiest picture for a party challenging an arbitration award, and we acknowledge that. This circuit has made clear that there is limited judicial review of arbitration awards, and that's in furtherance of a strong public policy favor in arbitration. But arbitration awards are not impregnable, and this Court has advised litigants of that on multiple occasions. If Congress intended there to be no judicial review of arbitration awards, Section 10A of the Federal Arbitration Act wouldn't exist, and nor would the Manifest Disregard Doctrine. But Section 10A in the Manifest Disregard Doctrine exists because Congress and the courts have recognized that some arbitration awards are so flawed that they do not warrant judicial imprimatur, and they're so flawed that they offend our notions of fairness such that they can't be enforced. The award at hand here must be one of the most or more deeply flawed awards this circuit has been presented with. Depending on how you group various arguments, there are between five and eight alternative bases for vacating this award, which is remarkable for a one-day arbitration and a six- or seven-page award. Could you help me clarify the Anderson issue, which I'm not quite understanding? Opposing counsel in his reply brief seemed fairly incredulous that this came up because they say that Anderson was never supposed to appear to testify in the first place and that you had made them aware that you were not planning to present Anderson. Yes, Your Honor, and so that issue is tricky. Mr. Anderson was intending to appear in the sense of giving testimony. He was going to be appearing by videoconference because of a medical condition he has. He ended up not – I'm sorry. Was that agreed upon? Yes, that was agreed upon, and the arbitrator had acknowledged that would happen. It was an understanding among the parties that he would appear by videoconference. Unfortunately, a second circumstance arose, and that was the unfortunate passing of his father several days before the arbitration. And I think the dispute that you are alluding to in the respondent's brief is the reference to something that is outside the record, which was a communication among counsel and with the arbitrator. That's outside the record, and we pointed out in our reply brief why that shouldn't even be resolved here. Well, did you make an effort to introduce the videotape deposition and were denied the right to do that? Yes, Your Honor. I'm trying to figure out if you had an agreement to do it. How was there an objection once you tried to do it? Well, so, Your Honor, the agreement was that he would be permitted to testify during that one-day arbitration hearing by videoconference. Once it became clear that he would not be able to make it that day for the videoconference testimony, IBC offered to have him submit his testimony by affidavit. There was an objection by the other side, and the arbitrator sustained the objection. There was then a suggestion that he be permitted to testify by deposition or other means at a later date when he would be available so that he could be with his family during this time. That, again, was denied by the arbitrator. The arbitrator came down hard and said, this is a one-day arbitration, he's not here right now, and we're going forward, and this arbitration hearing is going to be closed without his testimony because he's not here. Did you ask for postponement? No, Your Honor. Postponement was... Well, did you or didn't you? No, Your Honor, IBC did not request postponement, but inherent in the request for a later deposition date, I suppose, is a request for the record to stay open. I don't see that it's inherent at all. I think it's two different things. And, Your Honor, I don't disagree with you. Section 10A.3, which would be the pertinent portion of the Federal Arbitration Act on the vacate of awards, has two parts. One part is the refusal to grant a reasonable postponement request. The other part is the refusal to hear evidence pertinent to the matter. In light of not requesting a postponement, perhaps that first prong is implicable, but the second prong, the refusal to hear evidence... But if you have an adequate remedy for the problem, which was asking for a postponement, and you don't ask for it, then why should we bother about the second alternative? Well, Your Honor, I agree. I agree that it is a problem for IBC's position to the extent it's seeking relief for refusal to postpone the hearing. I concede that. But you can separate those portions, I contend, on 10A.3. You can have a refusal to hear evidence pertinent to the matter, even though you didn't request postponement. In hindsight, a request for postponement would have bolstered the argument, absolutely, and regrettably there wasn't one. But I don't think that dooms the second prong of that portion of the statute. Now, so one of the other bases, I mentioned there are multiple bases for vacating the work, perhaps the most important, and it's one that the respondent has imposed, so I don't want to spend too much time on it, but it's critical, is that the arbitrator ignored a governing term in the contract that was directly relevant and went to the heart of the dispute between the parties, and that question was, did IBC have an obligation to facilitate the sale of shares? Mr. Hoolian, sale of shares. And the term says, in unequivocal terms, That's paragraph 2.3e, little to I, at Appendix 27. Well, did IBC block the sale? IBC, the record, IBC did not block the sale. IBC did not, the allegation, and the finding by the arbitrator, was that IBC did not take steps that would have assisted Mr. Hoolian in completing the sale. But IBC's cooperation wasn't required, it was actually expressly contracted out of the agreement, and that's a provision that the arbitrator completely ignored. But was there something that IBC did that prevented Hoolian from selling? I'm sorry, your client from selling. Your Honor, my understanding is no, I don't want to misstate the record, my understanding is no, that there wasn't anything affirmative that IBC did. If counsel can come to the record. In other words, is there something that you did that made it an impediment to selling? In other words, could he just go on the free market without any other action on your client's part and sell? You know, my understanding is that his inability to sell his shares was due to a restrictive legend on the shares. This is a closely held, it's a small corporation, there are restrictive legends on the shares that were granted to him pursuant to the purchase and sale contract when he sold his business to IBC. The allegation is that IBC did not assist him in removing the legend. I don't believe there was anything affirmative that IBC is alleged to have done to prevent him from selling the shares. But that restrictive legend prevented him without IBC's assistance from selling. Your Honor, yes, that's the allegation, and I apologize for not knowing exactly the answer to your question. That's the allegation, but yes. But I don't, again, I'm not aware of anything in the record that establishes IBC did anything affirmative other than the existence of the restrictive legend on the shares. If that answers your question. So going back to this contractual provision, there's no reference in the award to it. In fact, the finding of a breach of contract indicates that the arbitrator completely ignored that provision. This would require vacating the award on two independent grounds. The first is under the FAA, under Section 1084, because the arbitrator exceeded his authority. By reading into the contract an obligation that IBC had expressly contracted out, and the Supreme Court decision of Oxford Health at 569 U.S. 564 would control there because there the court held that when an arbitrator exceeds his authority by failing to interpret the contract, that the quote is, the sole question is whether the arbitrator even arguably interpreted the party's contract, not whether he got the meaning right or wrong. In this instance, he clearly disregarded that governing term, the contract, because his finding completely contradicts it. So this falls into the category of failing to interpret the contract, which is a basis. Did you argue that to the arbitrator? Your Honor, yes. The issue of paragraph 2.3E, little 2, was argued to the arbitrator. It was presented in a pre-hearing brief. I believe it was also referenced on the record during the one-day arbitration. Let me find you a citation. I can find you a citation, Your Honor, but I know for a fact that it was presented in the pre-hearing brief of IBC to the arbitrator, and he ignored it. I do recall that there was also a reference to it that came up on the record at the arbitration hearing. So it was presented to him. He knowingly disregarded that and instead relied on two different provisions within the contract, neither of them that are specific or governing. They're just general provisions. One of those required IBC to take any action to, quote, complete, let me get to the, to carry out, quote, its obligations under the agreement. So IBC was required to take any necessary actions to carry out its obligations. But whatever its obligations were under the contract, we all know what one of them wasn't because it's expressly stated. It is not the obligation to facilitate the sale of shares. That has been carved out of the contract. Time is up, counsel. Thank you. Good morning, Your Honors. May it please the Court, my name is Stephen Gordon. I represent the appellee, Mr. Gerald R. Hoolihan. This case arises out of a breach of a contract for the sale of a business, actually the stock in a going business, which was owned by Mr. Hoolihan and his partner, Mr. Matheson. There was an arbitration provision. So the stock that's still in your client's possession still bears the restrictive legend?  The restrictive legend was one of timing. When the time expired so that Mr. Hoolihan and Mr. Matheson could then sell their stock, the legend no longer became applicable. What was applicable in this case is that the stock, they sold their shares of stock in their company for a combination of cash and stock in the appellant IBC. But your client still has stock which is now marketable? At a very, very small amount, Your Honor. And the stock has been subject to various reverse splits. We originally sought damages of $1.8 million, but because of the way the arbitrator calculated the damages, the arbitrator said that IBC had permitted Mr. Matheson, the partner, to sell his shares on a certain schedule. And if Mr. Hoolihan sold on the same schedule, minus what he received and minus the value of the stock that he retained, the damages would be the $1.2 million that the arbitrator actually allowed. It was a very reasoned decision on damages. It was briefed, it was argued, and it was a very reasoned decision on damages. The issue here is there is a very clear contractual provision on which the arbitrator relied. And that provision is, as the arbitrator said, that provision is the further assurances clause which appears at page 57 of the appendix. And it says that IBC has to take whatever action is necessary to give effect to the contract. Now, the appellant comes here and says, but there's a specific provision that says that IBC does not have to take any action to facilitate the sale. And Mr. Ling quoted language from the contract, and he put the language in his brief, I believe his reply brief, and bolded some of the language. What he didn't say here this morning, and what he didn't bold in his brief, are four words. In the United States. There is no obligation, we admit, there is no obligation of IBC to register the shares in the United States or to facilitate their sale in the United States. That is not what Mr. Houlihan tried to do. Mr. Houlihan tried to sell his shares on the Toronto Stock Exchange, where they were at all material times and still are traded. And there was no attempt to market or sell the stock or to seek IBC's action in furtherance of the sale of the stock in the United States. Excuse me. Yes, Your Honor. Would you agree with me that if the award is unfounded in reason, in fact, it is subject to a challenge in court? I would not agree with that because, Your Honor. We have a case of this circumstance. So let's assume that that is the case, that that is the law. This award clearly is not unfounded or unreasonable. That's the next point. If we agree that those are grounds for vacating an award, I would like to know if, in fact, the arbitrator failed to account that your client had already sold 250,000 shares in 2013. He fully accounted for that. That was evidence of the arbitration. It was freely admitted. The arbitrator knew how much shares he had sold once he was permitted to do so, what he received from them, and how many shares he still had, although at a very minimal value, and that was the reason why the award is $1.2 million and not the $1.8 million that we sought. What the arbitrator did very carefully That's 250,000 shares in 2013. You say the award takes that into account? Yes, Your Honor, because what the award says is that IBC offered to the partner, Mr. Matheson, an agreement whereby they would permit him to sell shares on a specific schedule. What the arbitrator said is that Mr. Houlihan should have been offered, under the further assurances clause, the same agreement, and if he had received that agreement, he would have received a certain amount of money for his shares from which the arbitrator deducted the amount he actually received and the current value of the shares he still held. It was a very reasoned decision. It was a very clear calculation. There was a first request for a redo of the arbitration with a motion to the arbitrator that somehow his computation was incorrect. That was briefed and that was responded to by the arbitrator that his computation was not incorrect. He had taken into account both the sale by Mr. Houlihan and the retained shares at a tiny value by Mr. Houlihan. Did Mr. Houlihan seek to sell his shares as did Mr. Matheson and was refused? They both sought to sell their shares. Mr. Matheson was offered an agreement whereby IBC would do what he was required to do under the further assurances clause in the contract and cooperate. All they had to do was tell the transfer agent in Toronto, it's okay to transfer these shares. That's all they had to do. They didn't have to do anything else. The question is, did Houlihan seek that same? Yes, Your Honor. That's the reason why we're here. Houlihan sought the same thing. He was told by the transfer agent, IBC's transfer agent, that IBC would not permit it. This is the whole crux of the issue with Attorney Schoenberger. The transfer agent said, you need to call Mr. Anderson at IBC, and here's his number, to find out why they will not permit this transfer to go forward. Mr. Houlihan very, very much tried, and he so testified. We actually have a transcript of arbitration, which is unusual. Mr. Houlihan testified that he made attempts, and unsuccessful attempts, to sell his stock after the stock restriction expired, and he was not able to do so because IBC blocked it in violation of the contract, and certainly in breach of the covenant of good faith and fair dealing. That's exactly what the arbitrator found. Excuse me. Can you direct me to where in the final award this issue that I raised is covered? Because I don't seem to be able to find it. It is not in the final award. The final award is based on the arbitrator's decision. The truth is the arbitrator could have just written a number down on a piece of paper. The arbitrator did not go through all the steps that he chose to come up with the award. But this much we do know, and that is that the award is not by any means outrageous or unusual. I wish we could stick to my subject for the time being. I'm confused enough. I would like to know, from looking at this award, or anywhere in the record that the arbitrator took into consideration the sale of those stocks. The arbitrator, there was testimony at the arbitration hearing of the sale of the 250,000 shares, the amount received for the 250,000 shares, and there was briefing, post-hearing, there was briefing on the damages issue. And in accordance with that briefing, that's what gave the arbitrator the reason to reduce the award from the $1.8 million that had been claimed to the $1.2 million actually awarded. So, in the award, he doesn't do that arithmetic in the award. My question is, how do I know that the arbitrator actually took that into consideration? From reading the award, I can't find it. I don't believe that the arbitrator was required to put all of his computations in the award. Again, there was a motion, there was motion practice in arbitration post-award, in which the calculation of the award was challenged. One side said one thing, the other side said the other thing. The arbitrator came out with a third thing. That's what arbitration is, Your Honor. I understand what arbitration is, Counselor. I've been involved in quite a few of them. I'm sure of that. Thank you. So, really, this court is being asked for the third time to redo the arbitration. The arbitrator was asked to redo the arbitration. The district court was asked to redo the arbitration. And this court is now being asked.  Mr. Lane said it correctly. Because in hindsight, IBC would have handled the arbitration differently. I don't think that that's a basis for undoing a valid award. This arbitration started, commenced in 2016. Even if this court were to rule today, regardless of its ruling, a mandate cannot issue until 2020. There's been a lot of travel in this case. The appellant has come up with a contractual provision, which absolutely doesn't apply, because he didn't tell us about the awards in the United States. The appellant has come up with reasons why this arbitration award, the amount, should not be allowed or should be questioned, because the arbitrator didn't specify exactly how he calculated the award. If, in fact, the sale of the stock, the 250,000 shares by Mr. Houlihan, was concealed, then we would have a different story. It was testified to at arbitration. It was a known fact. The arbitrator had to take it, or was certainly able to take it, into consideration. The only thing that the appellant is saying is, didn't give it enough consideration. Well, that wasn't the measure of damages. What the arbitrator decided the appropriate measure of damages should be, what Mr. Houlihan would have received if he had received the benefit of the Matheson agreement, which was necessary in compliance with the further assurances clause of the contract, and what he actually did receive or could now receive from his retained stock. That was the measure of damages. Given the fact that at the time of the sale, the number of shares that both Mr. Matheson and Mr. Houlihan received were calculated to be, on the closing date, worth $1 million, the award of $1.2 million is a very fair and reasonable recognition of the fact that for a period of time that stock did go up, and then unfortunately it went way down. Suppose it goes back. I'm just concerned because your client is still in possession of the stock which could rise, and I'm trying to figure out how does the award take that into consideration? The award took that into consideration as to, at the time of the hearing, what was the value of the stock. If the stock were to rise, it has not. But if the stock were to rise, at that point in time, Mr. Houlihan was making no further claim. If the stock were to fall, that he was entitled to more money, and I don't believe that IBC can be heard to say if Mr. Houlihan chose to hold the stock and it rose. At that point in time, he was making an independent decision. At the point in time when IBC prevented him from selling the stock, he was not able to make that decision as to whether he should hold or sell, and that's where the damages come in in this case. I would thank you ladies very much for your attention. Thank you. Thank you, Your Honor. I guess I'd first like to get to the question that Judge Teriwaya made. There is nothing in the award or in the record for that matter. So how do I know you're right? Your Honor, there are two questions, two points. First is the argument that counsel just made that this worked out here, and that argument's never been raised in the past. The response in the past was an implicit acknowledgment that the award did not account for the previously sold shares and the still-held shares, but IBC failed to timely raise that in the arbitration, and that the award is final and the request for modification was denied. So there is an implicit acknowledgment that the calculation that we've presented, in other words, that the sale of shares in 2013 was not factored in, and that the fact that the shares were still held at the time of the award was not factored in. There's an implicit acknowledgment up until I just heard argument that that is true. Now, there's nothing in the record, and I've never heard the argument, that somehow the arbitrator did factor those in, but didn't inform the parties of how it did that in its calculation. Well, there's some case law to support the notion that the arbitrator is obligated to give a detailed explanation of the damage award, because my thinking is that our case law is to the contrary. Your Honor, I'm not aware of that case, of such case law. I'm aware of decisions criticizing arbitration awards for not giving that sort of specificity, but I'm not aware. For leaving them in place. I'm sorry. For leaving the awards in place. Correct, correct. But still, nevertheless, criticizing arbitration awards for not giving that specificity. But, Your Honor, I'm not aware of any statute or other law requiring that sort of specificity, unfortunately. It would be nice to have that in all cases, but we don't have that. I also wanted to address... The question about whether an award can be vacated in the circuit if it is unfounded in reason or fact, clearly is the law of the circuit. That's been stated time and time again. It's been a basis for vacating an award. It is the law of the circuit. It applies here. And it fits in multiple contexts here. It fits not just in the context of whether there was a windfall and damages. We've discussed that. It also fits in the context of the contractual discussion earlier, where you have a specific contractual provision that we say governs, and there's a disagreement on that. In our position, that contract, that specific term governs, it was ignored in favor of two general provisions that don't seem to apply. What specific term do you say applies? Paragraph 2.3E. And that's the one that talks about in the United States? That's correct. So? As to the United States argument? Yes. So, IBC is registered on the Toronto Exchange. Mr. Grohan is a United States citizen. He's a resident of Florida. As far as I know, he's not a citizen of anywhere other than the United States. The agreement contemplated him attempting to sell his shares within the United States. Does the agreement say that? The agreement does not say that it contemplates him selling the shares other than the language was inserted in the United States. But the agreement, as far as I remember, does not state, well, I shouldn't say without knowing, but I don't recall anything from the agreement that states his residence. It may state that he's a United States citizen. Is there a submission to arbitration in writing, in the record? Your Honor, well, there… Was there a requirement? I'm sorry. In the record, there is no submission to arbitration other than there's an arbitration clause. Other than that, was there any written document stating what the duties of the arbitrator were as far as a decision? Not in the record, Your Honor, and I'm not aware of anything else. In other words, were there limitations on the arbitrator's authority? The limitation would be in the specific language of the arbitration agreement, which would be the authority to resolve disputes between the parties. That's pretty broad. It is broad, but the dispute between the parties is whether one party breached the contract, not whether one party breached some term that is later imposed on a party outside of the contract. That's where it would be in excess of the arbitrator's authority. Thank you. Thank you, Your Honor.